**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
|      Plaintiff, | |
|        v. | Case No. 1:22-cv-01464-RDM |
| GRAVITY DEFYER MEDICAL TECHNOLOGY CORP., *et. al.*, | |
|      Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION TO DISMISS COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

**TABLE OF AUTHORITIES** ................................................................................................ ii

**INDEX OF EXHIBITS** .................................................................................................... vii

**INTRODUCTION** ............................................................................................................1

**BACKGROUND** ..............................................................................................................3

    **Gravity Defyer and Mr. Elnekaveh** ..............................................................................3

    **The UCLA Study** ..........................................................................................................4

    **The FTC's Investigation** ...............................................................................................4

    *AMG Cap. Mgmt.* ...........................................................................................................5

    **The Expired 2001 Order** .............................................................................................6

    **The FTC's February 17, 2022 Letter** .......................................................................10

**ARGUMENT** .................................................................................................................11

    I.    The Court Should Dismiss All Counts (I–IV) Where the FTC Fails to
           Plausibly Allege Unlawful Conduct ...............................................................12

           A.    The FTC Fails to Plausibly Allege that Any Testimonial Claims
                  Violate the 2001 Order (Count I) ...............................................................12

           B.    The FTC Fails to Plausibly Allege that Statements About the UCLA
                  Study Violate the 2001 Order, or Sections 5(a) or 12 of the FTC Act
                  (Counts II–IV) ............................................................................................15

                1.    The FTC Must Be Able to Demonstrate that Speech Referencing
                    the UCLA Study Would Be Inherently Misleading ...........................17

                2.    The FTC's Complaint Fails to Allege Any Facts that Could
                    Plausibly Show that Speech About the UCLA Study Would Be
                    Inherently Misleading ........................................................................20

    II.    The Narrow Scope and Prior Termination of the 2001 Order Provide
           Separate, Additional Grounds for Dismissal .................................................24

           A.    The FTC Has No Authority to Enforce the 2001 Order Against
                  Gravity Defyer, an Unnamed and Unrelated Third Party ..........................24

           B.    The 2001 Order Reaches "Purported Fuel-Saving or Emissions-
                  Related Products," Not Footwear ...............................................................27

           C.    The 2001 Order Is No Longer "in Effect" for Purposes of Section
                    5(*l*) Enforcement ......................................................................................30

**CONCLUSION** ..............................................................................................................34

## **TABLE OF AUTHORITIES**

**Article III Court Decisions**                                                                    **Page**

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) ..................................................12

*ADT, LLC v. NorthStar Alarm Services, LLC*, 853 F.3d 1348 (11th Cir. 2017)............................25

*AMG Cap. Mgmt., LLC v. Fed. Trade Commn.*, 41 S.Ct. 1341 (2021) ................................. *passim*

*Am. Home Prod. Corp. v. Fed. Trade Commn.*, 695 F.2d 681(3d Cir. 1982) ..............................27

*Andueza Croce v. Garland*,
    CV 21-00264 (RC), 2021 WL 5206106 (D.D.C. Nov. 9, 2021) .......................................5

*Ashcroft v. lqbal*, 556 U.S. 662 (2009) .............................................................11, 12, 21

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ........................................11

*Basic Research, LLC v. Fed. Trade Commn.*,
    2:09-CV-0779 CW, 2014 WL 12596497 (D. Utah Nov. 25, 2014) ............................15, 21

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) ................................................17, 18

*Bell A. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................11, 21

*Bowman v. Iddon*, 848 F.3d 1034 (D.C. Cir. 2017)........................................................12

*Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152 (D.D.C. 2013) ....................................13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commn. of New York*,
    447 U.S. 557 (1980)...........................................................................18, 19

*Fedders Corp. v. Fed. Trade Commn.*, 529 F.2d 1398 (2d Cir. 1976) .........................................30

*Fed. Trade Commn. v. Acquinity Interactive, LLC*,
    No. 14-60166-CIV, 2021 WL 4840585 (S.D. Fla. Sept. 29, 2021)...................................25

*Fed. Trade Commn. v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985).......19

*Fed. Trade Commn. v. COORGA Nutraceuticals Corp.*,
    201 F. Supp. 3d 1300 (D. Wyo. 2016).......................................................20–21

*Fed. Trade Commn. v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) ....................................24

*Fed. Trade Commn. v. Garden of Life, Inc.*, 516 F. App'x 852 (11th Cir. 2013).........................21

*Fed. Trade Commn. v. SuperTherm, Inc.*,
    No. CV-20-08190-PCT-DWL, 2021 WL 3419035 (D. Ariz. Aug. 5, 2021)....................29

*Glenn v. Fay*, 281 F. Supp. 3d 130 (D.D.C. 2017) .......................................................11

*Golden State Bottling Co. v. Nat'l Labor Rel. Board*, 414 U.S. 168 (1973) ...............................25

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*,
    CV 14-03954 DDP MANX, 2014 WL 6892141 (C.D. Cal. Nov. 5, 2014)................14–15

*Implant Direct Sybron Intern. v. Zest IP Holdings, LLC*,
    11-CV-2247-LAB-WVG, 2012 WL 1969292 (S.D. Cal. June 1, 2012) ..........................13

*Kimberly-Clark Corp. v. Dist. of Columbia*, 286 F. Supp. 3d 128 (D.D.C. 2017) .................17, 18

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .................................................11

*LabMD, Inc. v. Fed. Trade Commn.*, 894 F.3d 1221 (11th Cir. 2018) ........................................30

*Litton Industries, Inc. v. Fed. Trade Commn.*, 676 F.2d 364 (9th Cir. 1982) ........................27, 28

*Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) ...........................................12, 13, 21

*Papasan v. Allain*, 478 U.S. 265 (1986) ....................................................................................11

*Pearson v. Shalala*, 130 F. Supp. 2d 105 (D.D.C. 2001) ...........................................................17

*Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999) ............................................................... *passim*

*Peel v. Att'y Registration & Disciplinary Commn. of Illinois*, 496 U.S. 91 (1990) ....................17

*In re R. M. J.*, 455 U.S. 191, 203 (1982) ...................................................................................19

*Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9 (1945) ...............................................................24–25

*Removatron Int'l Corp. v. Fed. Trade Commn.*, 884 F.2d 1489 (1st Cir. 1989) ..........................29

*In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373 (D. Md. 2020) .............................................29

*Salvador v. Allstate Prop. and Cas. Ins. Co.*,
   CV 19-2754 (RJL), 2020 WL 7042843 (D.D.C. Nov. 30, 2020) .....................................13

*Smith v. Hartz Mt. Corp.*,
   3:12-CV-00662, 2012 WL 5451726 (N.D. Ohio Nov. 7, 2012) .................................13–14

*Spector v. Mondelez Intl., Inc.*,
   15 C 4298, 2017 WL 4283711 (N.D. Ill. Sept. 27, 2017) ...................................11–12, 21

*Standard Oil Co. v. Fed. Trade Commn.*, 577 F.2d 653 (9th Cir. 1978) ....................................27

*Sterling Drug, Inc. v. Fed. Trade Commn.*, 741 F.2d 1146 (9th Cir. 1984) ................................29

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) ...........................................................20

*Trudeau v. Fed. Trade Commn*, 456 F.3d 178 (D.C. Cir. 2006) ................................................11

*United States v. Ancorp Nat. Servs., Inc.*, 516 F.2d 198 (2d Cir. 1975) ...................................30

*United States v. Bayer Corp.*,
   No. CV 07-01(JLL), 2015 WL 5822595 (D.N.J. Sept. 24, 2015) ...............................15, 21

*United States v. Daniel Chapt. One*, 896 F. Supp. 2d 1 (D.D.C. 2012) ....................................31

*United States v. Danube Carpet Mills, Inc.*, 737 F.2d 988 (11th Cir. 1984) ..............................30

*United States v. J.B. Williams Co.*, 498 F.2d 414 (2d Cir. 1974) ...............................................31

*United States v. Louisiana-Pac. Corp.*, 754 F.2d 1445 (9th Cir. 1985) .....................................30

*United States v. Phelps Dodge Indus., Inc.*, 589 F. Supp. 1340 (S.D.N.Y. 1984) ......................31

*United States v. St. Regis Paper Co.*, 355 F.2d 688 (2d Cir. 1966) ........................................32–33

*United States v. Standard Distributors, Inc.*, 267 F. Supp. 7 (N.D. Ill. 1967) .............................33

*Ward v. D.C. Dept. of Youth Rehab. Services*, 768 F. Supp. 2d 117 (D.D.C. 2011) .....................4

*Washington Exec. Services, Inc. v. Hartford Cas. Ins. Co.*,
  567 F. Supp. 3d 1 (D.D.C. 2021) ..................................................................................12

*Washington Legal Found. v. Friedman*, 13 F. Supp. 2d 51 (D.D.C. 1998) .......................18–19, 20

*Washington Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir. 2000) ....................................18–19

*Washington Metro. Area Transit Commn. v. Reliable Limousine Serv., LLC*,
  776 F.3d 1 (D.C. Cir. 2015) ....................................................................................25, 26

*Whitaker v. Thompson*, 248 F. Supp. 2d 1 (D.D.C. 2002) .................................................17

*Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457 (2001) ........................................5

## Article III Court Filings

Compl., *Fed. Trade Commn. v. Facebook, Inc.*,
  No. 1:19-cv-02184 [Dkt. 1] (D.D.C. July 24, 2019) .........................................................31

Stip. J., *Fed. Trade Commn. v. Gerber Prod. Co.*,
  No. 2:14-cv-06771-SRC-CLW [Dkt. 108] (D.N.J. July 15, 2019) ........................................29

Compl., *Fed. Trade Commn. v. Int'l Research and Development Corp.*,
  No. 04C 6901 [Dkt. 1] (N.D. Ill. Oct. 27, 2004) ............................................................7

Stip. Orders, *Fed. Trade Commn. v. Int'l Research and Development Corp.*,
  No. 04C 6901 [Dkt. 39, 41] (N.D. Ill. Apr. 20, 2005) .......................................................7

Stip. Order, *Fed. Trade Commn. v. Int'l Research and Development Corp.*,
  No. 04C 6901 [Dkt. 103] (N.D. Ill. Aug. 9, 2006) ..........................................................8

Compl., *Fed. Trade Commn. v. iSpring Water Systems, LLC*,
  No. 1:19-cv-01620-AT [Dkt. 1] (N.D. Ga. Apr. 10, 2019) .................................................31

Stip. J., *Fed. Trade Commn. v. Komaco Int'l, Inc.*,
  No. CV 02-04566 LGB (RNRx) [Dkt. 34] (C.D. Cal. Dec. 12, 2002) ..................................30

Perm. Inj., *Fed. Trade Commn. v. Loma*,
  No. 1:11-cv-01483-MJG [Dkt. 206] (D. Md. Mar. 24, 2014) ............................................29

Stip. J., *Fed. Trade Commn. v. Reebok Int'l Ltd.*,
  No. 1:11-cv-02046-DCN [Dkt. 5] (N.D. Ohio Sept. 29, 2011) ...........................22, 29–30

Stip. J., *Fed. Trade Commn. v. Skechers U.S.A., Inc.*,
  No. 12-cv-1214-JG [Dkt. 5] (N.D. Ohio July 12, 2012) ....................................................22

Compl., *Fed. Trade Commn. v. Twitter, Inc.*,
  No. 3:22-cv-03070 [Dkt. 1] (N.D. Cal. May 25, 2022) ....................................................31

Compl., *Fed. Trade Commn. v. Warshak*,
  No. 06-cv-51, 2006 WL 4821352, (S.D. Ohio Jan. 31, 2006) ...........................................23

Compl., *United States v. B4B Earth Tea, LLC*,
  No. 22-cv-1159, 2022 WL 625478 (E.D.N.Y. Mar. 3, 2022) ........................................23–24

## Administrative Decisions

*BASF SE*, FTC Dkt. C-4744, 2021 WL 2379533 (June 1, 2021) ...........................................29, 33

*Cephalon, Inc.*, 138 F.T.C. 583 (F.T.C. 2004)...............................................................................33

*ECM Biofilms, Inc.*, FTC Dkt. No. 9358, 2015 WL 575402 (Jan. 28, 2015) ..............................28

*Esrim Ve Sheva Holding Co.*, 132 F.T.C. 736 (F.T.C. 2001) ................................................. *passim*

*Google Inc.*, 152 F.T.C. 435 (F.T.C. 2011) ...................................................................................33

*Kellogg Co.*, FTC Dkt. C-4262, 2009 WL 2402679 (July 27, 2009) ............................................33

*Microsoft Inc.*, 131 F.T.C. 1113 (F.T.C. 2001)..............................................................................33

*Quicken Loans, Inc.*, 135 F.T.C. 424 (F.T.C. 2003) ......................................................................33

*Valeant Pharmaceuticals Int'l, Inc.*,
   FTC Dkt. No. C-4343, 2011 WL 7432274 (Dec. 9, 2011) ...............................................33

## Administrative Filings

Compl., *Esrim Ve Sheva Holding Co.*, FTC Dkt. No. C-4030 (Dec. 17, 2001) .............................8

Compl., *Kellogg Co.*, FTC Dkt. No. C-4262, 2009 WL 2402679 (July 27, 2009).......................23

## Statutes

15 U.S.C. § 45 (FTC Act § 5) .................................................................................... *passim*

15 U.S.C. § 52 (FTC Act § 12) .......................................................................................16

15 U.S.C. § 53 (FTC Act § 13) ................................................................................ *passim*

28 U.S.C. § 2462.............................................................................................................30

## Regulation

16 C.F.R. § 3.72 .............................................................................................................32

## Rules

FED. R. CIV. P. 12.........................................................................................................11

FED. R. CIV. P. 65.........................................................................................................24

## Other Authorities

Fed. Trade Commn., *Comments in the Matter of Request for Comment on First Amendment
   Issues*, FDA Dkt. No. 02N-0209 (Sept. 13, 2002)....................................................19–20

Fed. Trade Commn., *Dietary Supplements: An Advertising Guide for Industry* (1998) ..............21

Fed. Trade Commn., *Health Products Compliance Guidance* (2022) ..........................................23

Fed. Trade Commn., *Final Rule Regarding Duration of Competition and Consumer
   Protection Orders*, 60 Fed. Reg. 58,514 (Nov. 28, 1995) ..................................................32

Fed. Trade Commn., *Policy Statement Regarding Duration of Competition and Consumer Protection Orders*, 60 Fed. Reg. 42,569 (Aug. 16, 1995) ..........................................31–32

Fed. Trade Commn., *Proposed Rule Regarding Duration of Competition and Consumer Protection Orders*, 60 Fed. Reg. 42,481 (Aug. 16, 1995) .................................................32

## <u>LIST OF EXHIBITS</u>

**Exhibit A**    Ross, *et al.*, *Knee Pain Reduction Using a Shock-Absorbing Sole*, J AM POD MED ASSN 112(1) (Jan. 2022)

**Exhibit B**    FTC Civil Investigative Demand (July 8, 2019)

**Exhibit C**    Order, *Esrim Ve Sheva Holding Co.* (Aug. 29, 2001)

**Exhibit D**    Letter from Maria Del Monaco to J. Kathleen Bond (Feb. 17, 2022)

## INTRODUCTION

Gravity Defyer and Alexander Elnekaveh are incidental to this case. In fact, the main player here is the FTC, an agency still reeling from a significant Supreme Court loss in 2021. As the FTC scrambles to recover authority lost, it has put forth a peculiar, entirely speculative case that disregards First Amendment protections afforded to commercial speech.

In *AMG Cap. Mgmt.*, a unanimous Court held that, under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), the FTC lacked authority to seek equitable monetary relief directly in federal court, without taking a case through its administrative court. *See AMG Cap. Mgmt., LLC v. Fed. Trade Commn.*, 41 S.Ct. 1341, 1348 (2021). In the four decades preceding that decision, Section 13(b) had been the FTC's primary means of extracting money for alleged unfair, deceptive, or anticompetitive business practices.

Since the *AMG Cap. Mgmt.* decision, the FTC has endeavored (unsuccessfully) to convince Congress to revise Section 13(b). The agency has simultaneously sought to expand interpretation of other statutory sections to reclaim power to compel payments. One such authority is Section 5(*l*) of the FTC Act, 15 U.S.C. § 45(*l*)—at issue in this case. While a prior administrative order is "in effect," Section 5(*l*) allows the FTC to seek civil penalties, mandatory injunctions, and "such other equitable relief and . . . remedies" for alleged violations. Here, the FTC seeks to test whether an order that is both inapplicable and expired might still serve as the basis for Section 5(*l*) enforcement.

Mr. Elnekaveh cooperated with the FTC over 20 years ago in a case concerning someone else's phony product, and he now pays the price for that cooperation. Despite the misleading descriptions in the FTC's Complaint, entities and individuals wholly separate from Mr. Elnekaveh developed and sold devices that purportedly provided fuel savings and reduced automobile

emissions. The FTC never alleged that Mr. Elnekaveh had anything to do with developing or manufacturing those devices. Rather, at worst, based on the FTC's 2001 allegations, Mr. Elnekaveh and his long-shuttered company, Gadget Universe, ran a grand total of three ads (two catalog ads and one single-page internet ad) that parroted the device developer's claims. By its plain terms, the old 2001 no-money settlement order on fuel devices expired on December 17, 2021. With the passage of that date, it was no longer "in effect," and as such, no longer enforceable.

Eight weeks after that date, the FTC issued a letter stating that Gravity Defyer would be justified in making "a number of advertising claims" for its footwear "moving forward." Those claims included that the shoes "reduc[e] pain and discomfort" and that users could experience "8+ hour[s] . . . without any pain" at all. The same letter however said that, in order to settle a years-long investigation into Gravity Defyer's footwear advertising, the company would have to refrain from "cit[ing] or rely[ing] on" the clinical study giving rise to the claims. Effectively, the advertising claims could remain exactly the same, except that the study would be sacrificed to justify a settlement expanding FTC civil penalty authority.

Under well-settled First Amendment precedent, in order to ban all speech "cit[ing] or rely[ing] on" the UCLA Study, the FTC would have to be able to show that the study is so fatally flawed that not even qualifying language could cure the deception. But, the FTC skipped that step, scrambling to strike a deal that would expand its authority. If Mr. Elnekaveh and Gravity Defyer would simply agree to the offered settlement, dispensing with their peer-reviewed and published study, they could—in the patronizing words of the letter—"return to the business of selling shoes."

The FTC treats its settlement agreements as precedent. Had it been successful in forcing Mr. Elnekaveh and Gravity Defyer into this peculiar settlement, the agency would have used that "precedent" to show other companies that it can and has extracted civil penalties, regardless of a

prior order's narrow content or stated termination date. Perhaps equally important, the FTC could show other companies that it has censorship authority above and beyond well-settled First Amendment doctrine. Such power would not have been insignificant where numerous companies like Google, Kellogg, Valeant Pharmaceuticals, and BASF—to name only a few—are under FTC administrative orders. When Mr. Elnekaveh refused to accept the deal offered, the agency turned the force of the U.S. government against him and his company, filing this enforcement action.

With this case, the FTC asks this Court to rewrite Section 5(*l*) and the terms of the 2001 Order, so as to permit untimely enforcement against an unrelated entity for its unrelated advertising and products. But, the terms of the statute are clear, and clearly bar this action. Likewise, the FTC's allegations in this matter amount to no more than threadbare, speculative accusations that fail even to acknowledge the existence of applicable First Amendment standards. As such, this enforcement action should be dismissed.

## **BACKGROUND**

### **Gravity Defyer and Mr. Elnekaveh**

Based in Pacoima, California, Gravity Defyer is a medical technology company that manufactures and sells comfort footwear.[1] Mr. Elnekaveh is Gravity Defyer's Founder and Chair. Among its product offerings, Gravity Defyer sells footwear with VersoShock soles. Each sole contains, first and foremost, VersoShock technology, a three-part spring system "designed to absorb harmful shock from the ground up" with each step.[2] A lifelong inventor, Mr. Elnekaveh received a patent for VersoShock technology in 2012. *See* U.S. Patent No. 8,555,526. Over years of research and development, Gravity Defyer further refined its VersoShock sole to include not

---

[1] *See* Gravity Defyer Webpage, at https://www.gravitydefyer.com (cited at Compl. at 7, 16).

[2] *See* VersoShock Technology, at https://www.gravitydefyer.com/footwear-technology.

3

only VersoShock technology, but also other innovative features like a "rolling forefoot design" to "relieve pressure on toes and joints" and "linear and lateral stabilization" to "guard[] tendons from stress."[3]

### The UCLA Study

Gravity Defyer commissioned Olive View-UCLA Medical Center to conduct a human clinical study evaluating the pain relief properties of footwear with VersoShock soles. *See* **Exhibit A**, Ross, *et al*., *Knee Pain Reduction Using a Shock-Absorbing Sole*, J AM POD MED ASSN 112(1) (Jan. 2022) (cited at Compl., at 7, 16) (hereinafter, "UCLA Study"). Completed in 2017, the UCLA Study employed a "gold-standard" randomized, double-blind, and controlled design. Participants were nurses, physical therapists, and other hospital personnel who reported standing for most of the workday. For five weeks, they wore either Gravity Defyer shoes with VersoShock soles or shoes with traditional foam soles. Results showed that footwear with VersoShock soles significantly reduced knee, back, ankle, and foot pain compared to the control ($p<0.05$). The prestigious *Journal of the American Podiatric Medical Association* published the UCLA Study in its January 2022 issue, following peer-review. Gravity Defyer relies on the UCLA Study as its substantiation for pain relief claims.

### The FTC's Investigation

The FTC initiated its investigation into Gravity Defyer in July 2019, as the manuscript of the UCLA Study was being finalized. *See* **Exhibit B**, FTC, Civil Investigative Demand (July 8, 2019).[4]

---

[3] VersoShock Technology, at https://www.gravitydefyer.com/footwear-technology.

[4] *Ward v. D.C. Dept. of Youth Rehab. Services*, 768 F. Supp. 2d 117, 120 n.2 (D.D.C. 2011) (complaint arising from administrative proceedings necessarily relies on certain documents used in those administrative proceedings, which can be considered in judicial evaluation of a motion to

### *AMG Cap. Mgmt.*

In 2021, two years into the investigation, the FTC suffered a significant defeat before the Supreme Court. That case involved Section 13(b) of the FTC Act, a provision permitting the FTC to seek (1) temporary restraining orders and preliminary injunctions from federal court "pending the issuance of a complaint" in an FTC administrative proceeding, and (2) "in proper cases," permanent injunctions. Despite the clear language of the provision, the FTC had a long-standing practice of relying on Section 13(b) to obtain not only injunctions, but also equitable monetary relief in federal courts, without ever initiating administrative proceedings at all.

In *AMG Cap. Mgmt.*, the Supreme Court held that the statute means what it says. The Court unanimously rejected the FTC's argument that the reference to "permanent injunctions" authorized the agency to seek any type of equitable relief, including monetary equitable relief. 41 S.Ct. at 1348. According to the Court, to read those words "as allowing what they do not say, namely to dispense with administrative proceedings to obtain monetary relief as well, is to read the words as going well beyond the provision's subject matter." *Id.* The Court observed that "[i]f the Commission believes [its] authority too cumbersome or otherwise inadequate, it is, of course, free to ask Congress to grant it further remedial authority." *Id.* at 1352. However, the agency cannot use "a small statutory tail" to "wag a very large dog." *Id.* at 1348–49 (quoting *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001) ("Congress does not hide elephants in mouseholes." (cleaned up)).

The FTC has reacted to *AMG Cap. Mgmt.* Even prior to the decision, the agency asked Congress "to grant it further remedial authority," calling Section 13(b) "a critical tool in support

---

dismiss); *Andueza Croce v. Garland*, CV 21-00264 (RC), 2021 WL 5206106, at *3 (D.D.C. Nov. 9, 2021) (same).

of our enforcement missions [whose] effectiveness is currently imperiled."[5] Unable to convince Congress, the FTC took to Twitter the day of the decision, posting from its official account, "With this ruling, the Court has deprived the FTC of the strongest tool we had to help consumers when they need it most."[6] A commissioner added, "Scam artists and dishonest corporations come out on top and the American people lose as a result of today's decision. *The @FTC will be drawing on its other authorities to hold bad actors accountable*, but make no mistake: this one hurts."[7]

A year later, the FTC used an agency "open meeting" to object to the Supreme Court declining to uphold "the key engine of our law enforcement efforts for four decades."[8] The Chair then returned to Congress, assuring a House subcommittee that, "despite the major setback to the Commission's ability to recover equitable monetary remedies from the Supreme Court's decision in *AMG*, *the agency has deployed new tools and reinvigorated old ones to get money back to consumers where possible*."[9]

### The Expired 2001 Order

In an attempt to "deploy" a putative "new tool," the FTC now paints Mr. Elnekaveh as a resurrected mastermind of fraud, having shed his old Gadget Universe shell to reappear in the

---

[5] FTC Statement to Senate Committee on Commerce, Science, and Transportation at 9, (Apr. 20, 2021), https://www.ftc.gov/system/files/documents/public_statements/ 1589164/ prepared_statement_of_the_ftc_before_the_senate_committee_on_commerce_science_and_transportation.pdf.

[6] FTC Tweet (Apr. 22, 2021), https://twitter.com/FTC/status/1385262747814965252.

[7] Comm. Rebecca Kelly Slaughter Tweet (Apr. 22, 2021), https://twitter.com/RKSlaughterFTC/ status/1385334761799966720 (emphasis added).

[8] Chair Lina Khan, FTC Open Commission Meeting at 14 (Apr. 28th, 2022), https://www.ftc.gov/ system/files/ftc_gov/ pdf/ FTC%20 Open%20Commission%20Meeting%20-%20April%2028th %2C%202022%20-%20Transcript.pdf.

[9] Chair Lina Khan Testimony Before House Appropriations Subcommittee on Financial Services and General Government (May 18, 2022), https:// docs.house.gov/ meetings/ AP/ AP23/20220518/ 114778/HHRG-117-AP23-Wstate-KhanL-20220518.pdf (emphasis added).

livery of Gravity Defyer. In fact, Mr. Elnekaveh and his company themselves were taken advantage of twice: first by the makers of the fuel devices, then by the FTC. Only the FTC returned for a repeat performance.

While the FTC would like this Court to believe that Mr. Elnekaveh and Gadget Universe were the masterminds of some grand fraud leading to the order underlying this action, the record belies that contention. In a 2004 complaint, the FTC alleged that "[s]ince at least September 2000 and continuing to the present," a wholly unrelated company, "International Research and Development Corporation" and "Anthony Renda, individually" "manufactured, advertised, offered for sale, sold and/or distributed FuelMAX and/or Super FuelMAX throughout the United States." Compl., *Fed. Trade Commn. v. Int'l Research and Development Corp.*, No. 04C 6901, at 7 (E.D. Ill. Oct. 27, 2004). According to the FTC, along with "Diverse Marketing Group, Inc.," its related companies, and several officers, the many named defendants (none of whom were Mr. Elnekaveh or Gadget Universe) "induce[d] consumers to purchase" the devices through an array of "materially false and/or materially misleading statements" including "Increases Gas Mileage 27%" and "Reduces emissions 43%." *Id.* at 7–8. The named defendants allegedly disseminated such claims through "millions of commercial e-mail messages" in violation of CAN-SPAM, as well as "dozens of Internet Web sites"—none of which had anything to do with Mr. Elnekaveh or Gadget Universe. *Id.*

In 2005, the Diverse Marketing Group, Inc. defendants agreed to a $900,000 settlement for their part in marketing the devices.[10] In 2006, International Research and Development

---

[10] *See* FTC Press Release, Bogus Fuel-Saving Device Sellers Settle FTC Charges (May 10, 2005), https://www.ftc.gov/news-events/news/press-releases/2005/05/bogus-fuel-saving-device-sellers-settle-ftc-charges; Stip. Orders, *Int'l Research and Development Corp.*, No. 04C 6901 (E.D. Ill. Apr. 20, 2005).

Corporation and Renda agreed to a $4.2 million settlement with the FTC for their role as both manufacturer and marketer of the devices.[11]

In a much earlier, entirely separate 2001 complaint, the FTC alleged that Mr. Elnekaveh and his long-shuttered business, Gadget Universe, ran a total of three ads—two "catalog ads" and a single, one-page "[i]nternet ad"—for Super FuelMAX.[12] The exhibits attached to the FTC's 2001 complaint reflect that the grand total of three Super FuelMAX ads were among many ads Gadget Universe ran for various products like a certain BMW car, a portable Sony DVD player, and a wireless headset for cellular phones. *Id.*

The FTC sought *no* monetary redress from either Mr. Elnekaveh or Gadget Universe, and with a recession underway, both respondents agreed to enter into a settlement rather than incur the significant expense of litigation. They also believed that their law-abiding business had little to fear from an order requiring truthful advertising, even if violations could lead to significant civil penalties. (*See* Compl. Ex. A, Order, *Esrim Ve Sheva Holding Co.*, 132 F.T.C. 736 (F.T.C. 2001) (hereinafter "2001 Order")).

As the very fact of that 2001 settlement demonstrates, Mr. Elnekaveh and Gadget Universe had already ceased publication of the three ads in question, and fully cooperated with the FTC as soon as they became aware of the deceptive nature of the fuel devices. Mr. Elnekaveh signed the order on behalf of himself and his company on August 29, 2001. *See* **Exhibit C**. Remarkably, it would be another four months until the FTC would countersign, thereby finalizing the order on

---

[11] *See* FTC Press Release, *FTC Halts Bogus Claims for Fuel Saving Device* (Aug. 22, 2006), at https://www.ftc.gov/news-events/news/   press-releases/2006/08/ftc-halts-bogus-claims-fuel-saving-device; Stip. Order, *Int'l Research and Development Corp.*, No. 04C 6901 (E.D. Ill. Aug. 9, 2006).

[12] *See* Compl. & Exhibits, *Esrim Ve Sheva Holding Co.*, FTC Dkt. No. C-4030 (Dec. 17, 2001), at https://www.ftc.gov/sites/default/files/documents/cases/2001/12/evshcmp.pdf,   https://www.ftc.gov/sites/default/files/documents/cases/2001/12/evhcexhac.pdf (cited at Compl. at 2, 4–7).

December 17, 2001. Such delay reflects the likely truth of the matter: the FTC had no particular sense of urgency in bringing under order cooperative, trustworthy respondents who were essentially bystanders. The agency knew the threat of civil penalties, based on a final order, was more window dressing than a necessary deterrent to keep Mr. Elnekaveh and Gadget Universe in line.

That old, no-money settlement order against Mr. Elnekaveh and Gadget Universe "terminate[d]" after 20 years, on "December 17, 2021." 2001 Order, at 6. That termination should have set free respondents who, proportionality might suggest, never should have been under FTC order in the first instance, much less a 20-year order. *Id.* at 6.

Instead, five months after the 2001 Order expired, the FTC filed this lawsuit. The FTC could have filed its action in a timely manner at any point during the prior three years, to seek a swift end to the supposed new grand fraud by Mr. Elnekaveh and his company. But, the FTC declined to do so. The FTC could have undertaken an administrative proceeding under Section 45(b), 15 U.S.C. § 45(b), and/or sought an injunction under Section 13(b), instead of relying on a 20+ year old, expired administrative order on someone else's phony fuel devices. But, the FTC declined to do so.

The FTC's unsubtle intent in this case is to bring the force of the U.S. government against a small business, not because consumers have been harmed or companies should be discouraged from commissioning clinical studies from the likes of a UCLA-affiliated medical research and teaching facility. The FTC's sole motive is to expand its civil penalty authority under Section 5(*l*), following its loss in *AMG Cap. Mgmt.*

**The FTC's February 2022 Letter**

As noted above, the Supreme Court issued *AMG Cap. Mgmt.* as the FTC's investigation of Gravity Defyer was underway. Thus began the FTC's mission to "deploy[] new tools and reinvigorate[] old ones to get money."

In February 2022, the FTC announced to Gravity Defyer its position that the company "could make going forward" "a number of" the strongest claims that it had ever made in the past, including "8+ hour comfort so that people can stay active and on their feet all day without pain," "VersoShock technology . . . absorbs harmful shock, reducing pain and discomfort," and "Absorb harmful energy from hard surfaces like cement and concrete and leave people feeling restored, revitalized and ready to get back on their feet." **Exhibit D**, Letter from Maria Del Monaco to J. Kathleen Bond (Feb. 17, 2022).[13]

However, in order to conclude the agency's investigation, Mr. Elnekaveh and Gravity Defyer would be required to relinquish their First Amendment right to advertise the UCLA Study, the underlying support for the pain claims. As reflected in the February 2020 letter, Gravity Defyer had offered to add qualifications to its advertising to address any limitations the FTC might believe the study suffered. *Id.* The FTC, however, flatly rejected that offer, stating that Gravity Defyer must not "make any advertising claims that cite or otherwise rely" on the UCLA Study, whether qualified or unqualified. *Id.* ("the qualifying language . . . is unacceptable").

As another condition of settlement, the letter also provided that Gravity Defyer must pay some unspecified "monetary component," in the form of civil penalties, based on the expired 2001

---

[13] The February 2022 Letter makes clear that the FTC's position on Gravity Defyer's pain claims is distinct from its settlement demands. First, FTC referenced making these claims "going forward," and there is no dispute regarding future claims. Second, the FTC lacks the authority to permit consumer deception as a matter of compromise.

Order—an order directed at an entirely different company and concerning entirely different products. *Id.* In effect, all Gravity Defyer had to do was assist the FTC in creating the appearance of a legitimate consumer protection case, forging a new tool to obtain civil penalties from other companies based on irrelevant, expired orders.

All parties to this case agree that when a consumer purchases Gravity Defyer shoes for pain relief, the consumer in fact receives pain-relieving shoes. This case is about new tools, not consumer harm.

## **ARGUMENT**

A court must dismiss a complaint under FED. R. CIV. P. 12(b)(6) when a plaintiff fails to state a claim upon which relief can be granted. *Glenn v. Fay*, 281 F. Supp. 3d 130, 141 (D.D.C. 2017). While a court assumes the truth of all "well-pleaded allegations," *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), it does not assume the truth of "a legal conclusion couched as a factual allegation," *Trudeau v. Fed. Trade Commn.*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), or "inferences unsupported by the facts set out in the complaint." *Trudeau*, 456 F.3d at 193 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (cleaned up)).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. lqbal*, 556 U.S. 662, 678 (2009). The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell A. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading fails to provide fair notice of a legally cognizable claim "if it tenders naked assertions devoid of further factual enhancement." *Id.* (cleaned up). *See also Spector v. Mondelez Intl., Inc.*, 15 C 4298, 2017 WL 4283711, at *1 (N.D. Ill. Sept. 27, 2017) ("Plaintiff may not rely on the mere allegation of falsity,

which is conclusory and thus not entitled to the assumption of truth. Factual allegations to support that conclusory allegation are required.") (citing *Iqbal*, 556 U.S. at 679). Without facial plausibility, a court cannot draw the "reasonable inference that the defendant is liable for the misconduct." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018) (cleaned up); *accord Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (citing *Iqbal*, 556 U.S. at 678).

In ruling on the motion, a court may consider documents attached to the complaint, incorporated by reference in the complaint, and documents upon which the plaintiff's complaint necessarily relies, even where those documents are produced by the defendant, rather than the plaintiff. *Washington Exec. Services, Inc. v. Hartford Cas. Ins. Co.*, 567 F. Supp. 3d 1, 4 (D.D.C. 2021). The court may also consider documents in the public record of which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## I.   THE COURT SHOULD DISMISS ALL COUNTS (I–IV) WHERE THE FTC FAILS TO PLAUSIBLY ALLEGE UNLAWFUL CONDUCT

### A.   The FTC Fails to Plausibly Allege that Any Testimonial Claims Violate the 2001 Order (Count I)

Part III of the 2001 Order prohibits misrepresenting "expressly or by implication that the experience represented by any user testimonial or endorsement of the product represents the typical or ordinary experience of members of the public." 2001 Order, at 4. Only two exceptions are provided to this prohibition: (1) if  the "representation is true and, at the time it is made, respondents possess and rely upon competent and reliable scientific evidence that substantiates the representation"; or (2) "[r]espondents disclose, clearly and prominently, and in close proximity to the endorsement or testimonial, either: what the generally expected results would be for users of the product, or the limited applicability of the endorser's experience to what consumers may generally expect to achieve, that is, that consumers should not expect to experience similar results." 2001 Order, at 4.

Count I of the FTC's Complaint first asserts that Mr. Elnekaveh and Gravity Defyer ran advertisements with user testimonials claiming that Gravity Defyer shoes alleviate pain located in the "knees, back, or feet, or associated with conditions such as plantar fasciitis, arthritis, or neuropathy." (Compl. at 18.) Count I then alleges that such testimonials violated Part III of the order by (1) implying that users' experiences "represent the typical or ordinary experience," and (2) failing either to (a) be supported by "competent and reliable scientific evidence," or (b) disclose atypicality. (*Id.*)

In support of those extremely broad allegations, the FTC points to only one alleged fact: a single magazine advertisement that included the testimonial claim, "'I had lower back pain for years. Walking in these shoes was life changing for me. I feel like I'm walking on air'—Bill F." (Compl. at 10.) That single alleged fact fails to support any "reasonable inference," *Owens*, 897 F.3d at 272, that Gravity Defyer or Mr. Elnekaveh violated the 2001 Order.

It is axiomatic that in a case alleging false advertising, the plaintiff, at a minimum, must identify relevant advertisements and explain "what is false or misleading" about them. *Salvador v. Allstate Prop. and Cas. Ins. Co.*, CV 19-2754 (RJL), 2020 WL 7042843, at *3 (D.D.C. Nov. 30, 2020) (dismissing false advertising claim under District of Columbia Consumer Protection Procedures Act where plaintiffs failed to identify deceptive advertisements); *Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 174 (D.D.C. 2013) (same); *Implant Direct Sybron Intern. v. Zest IP Holdings, LLC*, 11-CV-2247-LAB-WVG, 2012 WL 1969292, at *3 (S.D. Cal. June 1, 2012) (dismissing a false advertising action where the plaintiff "d[id] little more than append four advertisements to its complaint and then, with no reference to [the advertisement's] particulars and no explanation, allege that they contain false and misleading statements that are likely to deceive consumers"); *Smith v. Hartz Mt. Corp.*, 3:12-CV-00662, 2012 WL 5451726, at *4 (N.D. Ohio

Nov. 7, 2012) (dismissing all false advertising allegations where the "plaintiffs d[id] not identify any specific advertising or marketing materials on which they may have relied in making their purchase").

Here, the FTC fails to identify any testimonials at all "claiming that shoes alleviate pain located in the knees . . . or feet, or associated with conditions such as plantar fasciitis, arthritis, or neuropathy." Bill F.'s testimonial is clearly about lower back pain. In *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, the court reviewed false advertising allegations by a seller of kitchen blenders against a competitor. CV 14-03954 DDP MANX, 2014 WL 6892141, at *1–2 (C.D. Cal. Nov. 5, 2014). The plaintiff alleged that the defendant "planted false reviews on the Internet, making false claims of defects in the Nutribullet blenders, and touting the Nutri Ninja as a superior alternative." *Id.* at *2. The court rejected those allegations as insufficiently pled to support an action. *Id.* at *6. The court explained as follows:

> [S]imply stating that "false reviews" can be found somewhere on the internet does not provide sufficient notice to the Defendant as to what exactly the plaintiff alleges, as the internet is vast and contains multitudes. And because the allegation is so vague, it also does not tend to show that the audience is likely to be deceived, that the message was placed into interstate commerce, or that the plaintiff has been or is likely to be injured. Some indication of the nature and scope of the communication is required to successfully allege false advertising.

*Id.* at *2. The FTC's allegations in this matter are even more vague as to any testimonials on anything but back pain. (Compl. at 18.) While the *Homeland Housewares* plaintiff at least identified the entire internet as the possible location of "false reviews," the supposed testimonials as to knee pain, foot pain, or pain related to "conditions" could be anywhere—including but not limited to the "vast" internet.

The FTC's allegations as to the single testimonial on back pain fare no better with only a threadbare assertion of the fact of the claim having been made claim. Beyond simply identifying the claim, the FTC identifies absolutely no facts "tend[ing] to show," *Homeland Housewares*, 2014

WL 6892141, at *2, that when consumers read about Bill F.'s "life changing" experience, they universalize that experience, to represent the "typical or ordinary experience of [all] members of the public."

In addition to failing to allege any supporting facts, the FTC asks this Court to assume a level of consumer naivety that defies reason. People very likely understand that any given comfort shoe, with extra cushioning and support, may work for any given consumer in addressing various discomfort. Thus, people very likely "get" that Bill F. might swear by his selected comfort shoe brand, but not everyone will. Consumers also likely understand that not every single advertising claim—particularly one couched as testimonial—is supported by "competent and reliable scientific evidence" confirming the experience as "typical or ordinary" for the purchasing public writ large. The FTC has provided no factual basis, much less a reasonable factual basis, to assume consumers were mesmerized by Bill F.'s testimonial in the way the FTC says they were. *See Basic Research, LLC v. Fed. Trade Commn.*, 2:09-CV-0779 CW, 2014 WL 12596497, at *13 (D. Utah Nov. 25, 2014) (granting summary judgment in favor of the advertiser; "The FTC plays an important role of ensuring that advertising claims are adequately supported so that consumers may have confidence in a product. Implicit in that role, however, is the expectation of reasonableness."); *United States v. Bayer Corp.*, No. CV 07-01(JLL), 2015 WL 5822595, at *16 (D.N.J. Sept. 24, 2015) (declining to hold advertiser in contempt where FTC positions failed to align with "longstanding understanding of substantiation requirements").

The Court should dismiss Count I of the Complaint.

**B.    The FTC Fails to Plausibly Allege that Statements About the UCLA Study Violate Either the 2001 Order or Sections 5(a) or 12 of the FTC Act (Counts II–IV)**

Part IV of the 2001 Order prohibits misrepresenting "in any manner expressly or by implication, the existence, contents, validity, results, conclusions, or interpretations of any test,

study, or research." Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices," while Section 12 prohibits "any false advertisement" for "food, drugs, devices, services, or cosmetics." *See* 15 U.S.C. §§ 45(a), 52.

Count II of the FTC's Complaint asserts that Mr. Elnekaveh and Gravity Defyer violated Part IV by "citing [the UCLA study]" and "hav[ing] represented that Gravity Defyer footwear is clinically proven to relieve pain, including knee, back, ankle, and foot pain." (Compl. at 18.) Similarly, Counts III and IV allege that Gravity Defyer's pain relief claims, including its percentage-based pain relief claims, are unsubstantiated and so violate Sections 5(a) and 12.

As the examples in the FTC's Complaint reflect, Gravity Defyer's advertising claims report exactly the results of the UCLA Study. Gravity Defyer makes pain reduction claims, generally, in addition to the following percentage-based claims taken directly from the study: "85% less knee pain," "91% less back pain," "92% less ankle pain," and "75% less foot pain." (Compl. at 9–15; *compare id. with* UCLA Study, at 4–5 and Table 4 (reporting results corresponding to the claims).)

Setting aside the undisputed accurate reporting of the study results, the only question remaining is whether the study might be invalid. As discussed below in Section I.B.1, where, as here, the FTC seeks an absolute ban on speech based on a study, the agency must be able to demonstrate that the study is so fatally flawed that any speech based on it would be inherently misleading, even with disclosure of the study's flaws or limitations. As discussed in Section I.B.2, despite such clear precedent, the FTC nevertheless has made no such allegation that the UCLA Study is fatally flawed. Moreover, even if it had, the agency puts forth only bare speculation, failing to allege plausibly that the UCLA Study is in any way unreliable, much less so fatally flawed that any speech based on it would be inherently misleading.

1.  **The FTC Must Be Able to Demonstrate that Speech Referencing the UCLA Study Would Be Inherently Misleading**

There is no dispute that the FTC is seeking to ban any and all commercial speech referencing the UCLA Study. As reflected in the February 17 letter, Gravity Defyer offered to add qualifications to its advertising to address any limitations the FTC might believe the study suffers. *See* Exhibit D, Letter from Maria Del Monaco, FTC, to J. Kathleen Bond (Feb. 17, 2022). The FTC, however, flatly rejected that offer, stating that Gravity Defyer must not "make any advertising claims that cite or otherwise rely" on the UCLA Study, whether in a qualified or unqualified manner. *Id.*

Under well-settled First Amendment precedent, the U.S. government may ban inherently misleading speech; however, "the 'preferred remedy for potentially misleading speech is 'more disclosure, rather than less." *Kimberly-Clark Corp. v. Dist. of Columbia*, 286 F. Supp. 3d 128, 145 (D.D.C. 2017) (citing *Pearson v. Shalala*, 164 F.3d 650, 657 (D.C. Cir. 1999)); *see also, e.g.*, *Peel v. Att'y Registration & Disciplinary Commn. of Illinois*, 496 U.S. 91, 91 (1990) ("Although [the government] may prohibit misleading advertising entirely, it may not place an absolute prohibition on potentially misleading information if the information may also be presented in a way that is not deceptive."); *Bates v. State Bar of Arizona*, 433 U.S. 350, 376 (1977).

"The D.C. Circuit has accordingly manifested a strong preference for affixing disclaimers to potentially misleading speech, rather than banning use of [a claim]." *Kimberly-Clark*, 286 F. Supp. 3d at 133; *see also, e.g.*, *Pearson v. Shalala*, 130 F. Supp. 2d 105, 114 (D.D.C. 2001); *Whitaker v. Thompson*, 248 F. Supp. 2d 1, 10–11 (D.D.C. 2002). In *Pearson*, for example, the D.C. Circuit rejected the FDA's position that it could ban outright certain health-related claims for dietary supplements simply because the agency found the claims failed to meet a standard of "significant scientific agreement." *Id.*, 164 F.3d at 651. The court, instead, held that the agency

17

must allow disclosures as the "preferred remedy," over "outright suppression," to cure any potential deception. *Id.* at 657 (quoting *Bates*, 433 U.S. at 376). The FDA, thus, could ban only speech that the agency could demonstrate is "inherently misleading," or in other words, "incurable by disclosure." *Id.* at 659. The court explained that "when the government chooses a policy of suppression over disclosure—at least where there is no showing that disclosure would not suffice to cure misleadingness—government disregards a 'far less restrictive' means." *Id.* at 658; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commn. of New York*, 447 U.S. 557, 564–65 (1980) (requiring that restrictions on commercial speech must be, *inter alia*, "narrowly drawn," meaning, for instance, favoring "warning or disclaimer" over "total suppression of advertising"). Likewise, in *Kimberly-Clark*, the court enjoined the District of Columbia government from drafting certain regulations in a manner that would outright ban Kimberly-Clark from promoting its hygienic wipes as "flushable," without any showing that the claim would be inherently misleading or incurable by disclosure. *Id.*, 286 F. Supp. 3d at 145.

In this case, the FTC's Complaint implies the agency's position that its jurisdiction over deceptive business practices somehow overpowers the foregoing First Amendment precedent, allowing the agency unique censorship authority to ban Gravity Defyer's speech without any allegation or showing, at all, that speech would be inherently misleading (i.e., incapable of being rendered non-misleading through qualification). The FTC, thus, would ban all commercial speech about the UCLA Study based on its insufficiently alleged and conclusory allegations about it. *Id.* Such a novel argument has already been rejected in this district, however, where the court found in *Pearson* that the FDA's jurisdiction over deception failed to defeat the First Amendment commercial speech doctrine. *See, e.g.*, *Pearson*, 164 F.3d at 657 (rejecting same argument by FDA as to its jurisdiction over "consumer fraud"); *cf. Washington Legal Found. v. Friedman*, 13 F.

18

Supp. 2d 51, 67 (D.D.C. 1998) *appeal dismissed, judgment vacated in part sub nom. Washington Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir. 2000) ("In asserting that any and all scientific claims about . . . prescription drugs are presumptively untruthful or misleading until the FDA has had the opportunity to evaluate them, FDA exaggerates its place in the overall universe. . . the conclusions reached by a . . . peer reviewed journal . . . are not 'untruthful' or 'inherently misleading' merely because the FDA has not yet had the opportunity to evaluate them.").[14]

There has never been any question that First Amendment commercial speech standards in fact apply to the FTC's regulation of advertising. *See, e.g., Fed. Trade Commn. v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985) ("Any restrictions imposed on deceptive commercial speech can be no broader than reasonably necessary to prevent the deception. . . . The restriction imposed, moreover, may not place an absolute prohibition on potentially misleading information if the information also may be presented in a way that is not deceptive.") (cleaned up) (citing *In re R. M. J.*, 455 U.S. 191, 203 (1982)). In fact, following the *Pearson* decision, the FTC submitted comments to FDA expounding on the First Amendment law applicable to both agencies.[15] The FTC quoted *Pearson* directly in advising that "[w]hen the

---

[14] Although the First Amendment violation is obvious on its face, applying the *Central Hudson* test for government regulation of commercial speech further confirms the violation. Among other requirements, government must show a "substantial interest to be achieved by restriction" and that the restriction is "narrowly drawn," meaning, for instance, favoring "warning or disclaimer" over "total suppression of advertising." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 564–65 (internal quotations omitted). The FTC has not identified, and could not identify, any justifiable interest in banning speech citing the UCLA Study, a clinical study peer-reviewed and published in a well-respected medical journal. Even if it did, such ban would sweep too broadly. *See id.* at 567 ("[T]he suppression of advertising reduces the information available for consumer decisions and thereby defeats the purpose of the First Amendment.").

[15] FTC, *Comments in the Matter of Request for Comment on First Amendment Issues*, FDA Dkt. No. 02N-0209 (Sept. 13, 2002), https://www.ftc.gov/sites/default/files/documents/advocacy_documents/ftc-staff-comment-food-and-drug-administration-concerning-first-amendment-issues/fdatextversion.pdf (emphasis added, internal footnotes omitted); FTC Press Release, *FTC Staff*

government seeks to impose a ban on potentially deceptive speech, the courts have said that 'at least where there is no showing that disclosure would not suffice to cure misleadingness,' the 'government disregards a far less restrictive means' to achieve its objective." Fed. Trade Commn., *Comments in the Matter of Request for Comment on First Amendment Issues*, FDA Dkt. No. 02N-0209, at 11 (Sept. 13, 2002) (quoting *Pearson*, 164 F.3d at 658 and citing *Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002); *Washington Legal Found.*, 13 F. Supp. 2d 51). The FTC's comments further advised that only "'if a potentially misleading claim is 'incurable by disclaimer'" can the government "'ban it outright.'" *Id.* (quoting *Pearson*, 164 F.3d at 658–59).

Where the FTC's undisputed aim in this case is to ban any and all commercial speech referencing the UCLA Study, the First Amendment requires the agency to be able to demonstrate that the UCLA Study is so fatally flawed that any speech about it would be misleading. The FTC has failed to make any such allegation.

## 2. The FTC's Complaint Fails to Allege Any Facts that Could Plausibly Show that Speech About the UCLA Study Would Be Inherently Misleading

The FTC has also failed to allege the existence of a set of plausible facts from which the reasonable inference can be drawn that speech about the UCLA Study would be inherently misleading. Although the FTC's Complaint is directed at undermining the UCLA Study as substantiation for Gravity Defyer's advertising claims, it fails in this respect.

According to the FTC's own guidance and clear case law, a "guiding principle for determining the amount and type of [claim substantiation] that will be sufficient is what experts in the relevant area of study would generally consider to be adequate." *Fed. Trade Commn. v.*

---

*Provides the FDA with Comments On First Amendment Commercial Speech Doctrine* (Sept. 20, 2002), https://www.ftc.gov/ news-events/ news/ press-releases/ 2002/ 09/ ftc- staff- provides- fda-comments-first-amendment-commercial-speech-doctrine ("The Commission vote authorizing staff to issue the comments in response to the FDA's request was 5-0.")).

*COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1309 (D. Wyo. 2016) (quoting Fed. Trade

Commn., *Dietary Supplements: An Advertising Guide for Industry*, at 10 (1998)); *see also Basic*

*Research, LLC v. Fed. Trade Commn.*, 2:09-CV-0779 CW, 2014 WL 12596497, at *13 (D. Utah

Nov. 25, 2014) (rejecting FTC criticisms of clinical evidence where criticisms failed to align with

scientific expert opinion); *United States v. Bayer Corp.*, No. CV 07-01(JLL), 2015 WL 5822595,

at *16 (same); *Fed. Trade Commn. v. Garden of Life, Inc.*, 516 F. App'x 852, 856 (11th Cir. 2013)

(same). The FTC, however, identifies no plausible scientific or other factual basis for its assertions

that the UCLA Study is in any way unreliable.

Instead, in order to make its case, the FTC squeezes into a single paragraph of its Complaint

a catalog of what it calls "substantial flaws." These supposed "substantial flaws," however, are

nothing but "conclusory" and "speculative" assertions, *Bell A. Corp. v. Twombly*, 550 U.S. 544,

555 (2007); *Spector v. Mondelez Intl., Inc.*, 15 C 4298, 2017 WL 4283711, at *1 (N.D. Ill. Sept.

27, 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)):

> The study cited in Gravity Defyer's ads has substantial flaws. Among other things,
> it was of insufficient size and duration, failed to ensure adequate double-blinding,
> failed to adequately control for other treatments that participants might have
> received (such as medications or physical therapy), relied solely on participants'
> self-reported pain levels instead of including range of motion or other functional
> tests, failed to take into account data from approximately twice as many participants
> who wore Gravity Defyer shoes with and without the VersoShock sole, and
> included results from participants who stopped wearing the shoes. It was also only
> designed to measure knee pain. Thus, the study was not sufficient to determine the
> effects of wearing Gravity Defyer footwear on knee, back, ankle, or foot pain, or
> pain associated with the specific conditions claimed.

(Compl. at 16.) In the foregoing, the FTC provides no factual basis at all for a "reasonable

inference," *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018) (cleaned up), as to

why 52 participants might be an "insufficient" size or five-weeks an "insufficient" duration[16]; how or why the double-blinding might have been inadequate; how "pain levels" could possibly be an invalid measure for a pain study; why medications or physical therapy, both used in the real world, should be controlled; why individuals who wore "Gravity Defyer shoes with and without the VersoShock sole" should be combined and analyzed with study data on individuals who wore Gravity Defyer shoes versus Champion control shoes; why data analysis should exclude "results from participants who stopped" using an assigned intervention, as is any study participant's obvious ethical right; or why statistically significant results from pre-determined measures of types of pain, other than knee pain, should be discounted.

Comparing the FTC's assertions to the UCLA Study itself—the only actual factual content the FTC identifies at all—the agency's allegations prove not only bare and speculative, but also implausible. It is undisputed that, on its face, the manuscript reports on a study with a size, duration, type of double-blinding, type of participant group, type of pain measure, data analysis, and results considered to be adequate by the well-qualified researchers at Olive View-UCLA Medical Center, the Institutional Review Board of Olive View-UCLA Medical Center, the author of the study manuscript, and the editors and peer reviewers for the *Journal of the American Podiatric Medical Association*.

In addition to the UCLA Study itself, the FTC's February 2022 letter casts further doubt on the plausibility of the FTC's allegations. As detailed above, that letter announced the FTC's position that Gravity Defyer "could make going forward" "a number of" the strongest claims that

---

[16] Notably on two occasions, the FTC has agreed to and federal courts have approved stipulated judgments requiring shoe studies to be of six weeks' duration, a mere one-week difference. *See* Stip. J., *Fed. Trade Commn. v. Reebok Int'l Ltd.*, No. 11-cv-2046 (N.D. Ohio Sept. 29, 2011); Stip. J., *Fed. Trade Commn. v. Skechers U.S.A., Inc.*, No. 12-cv-1214-JG (N.D. Ohio July 12, 2012).

the company had ever made in the past, including "8+ hour comfort so that people can stay active and on their feet all day without pain," "VersoShock technology . . . absorbs harmful shock, reducing pain and discomfort," and "Absorb harmful energy from hard surfaces like cement and concrete and leave people feeling restored, revitalized and ready to get back on their feet." **Exhibit D**, Letter from Maria Del Monaco to J. Kathleen Bond (Feb. 17, 2022). This permissiveness reflects the FTC's conclusion that Gravity Defyer shoes are designed with particular characteristics sufficient from a mechanical perspective to relieve pain. Such a mechanism of action, however, helps corroborate, not impugn, a clinical study. According to the agency's own guidance, "aspects . . . such as . . . a recognized biological or chemical mechanism to explain the effect, *add weight* to research findings." Fed. Trade Commn., *Health Products Compliance Guidance*, at 18 (2022) (emphasis added). Where the only actual factual matter at hand in this case undercuts the FTC's bare and speculative assertions, the FTC's Complaint should be dismissed.

The FTC has put forth before complaints alleging at least some factual matter providing some basis to infer that a clinical study might fail to support a company's advertising claims. For example, in a case against Kellogg's, the FTC alleged that the company exaggerated the results of a clinical study:

> [E]ating a bowl of Kellogg's® Frosted Mini-Wheats® cereal for breakfast is not clinically shown to improve kids' attentiveness by nearly 20% compared to kids who ate no breakfast[, as was stated in advertising]. In the clinical study referred to in respondent's advertisements . . . kids who ate Frosted Mini-Wheats® had an average of 10.6% better attentiveness three hours later than kids who had skipped breakfast.

Compl., *Kellogg Co.*, FTC Dkt. No. C-4262, 2009 WL 2402679, at *4 (July 27, 2009). As other examples, the FTC alleged that one company relied on a clinical study on a dietary supplement with substantially different ingredients than the advertised product, Compl., *Fed. Trade Commn. v. Warshak*, No. 06-cv-51, 2006 WL 4821352, ¶ 35 (S.D. Ohio Jan. 31, 2006), and that another

company sought to base COVID-19 treatment claims on a 15-person, unpublished, uncontrolled study that claimed "statistically significant efficacy" "without documentation or any supporting data analysis," Compl., *United States v. B4B Earth Tea, LLC*, No. 22-cv-1159, 2022 WL 625478, ¶ 28 (E.D.N.Y. Mar. 3, 2022).

No such allegations have been made here. In its Complaint against Gravity Defyer, the FTC identifies a peer-reviewed and published, randomized, double-blind and controlled clinical study. The agency, then, relies on bare speculation to impugn that study. The Complaint fails to identify any facts that, even taken as true, could state a plausible claim that the UCLA Study is in any way unreliable, much less so fatally flawed that any speech about it would be "inherently misleading" or "incurable by disclosure." *Pearson*, 164 F.3d at 658–59.

"A district court must retain the power to insist upon some specificity in pleading," particularly where "the FTC's Complaint says almost nothing concrete on the key questions." *Fed. Trade Commn. v. Facebook, Inc.*, 560 F. Supp. 3d 1, 20 (D.D.C. 2021) (cleaned up). Because the FTC here has said almost nothing concrete on the key questions of Counts II–IV of the Complaint, the Court should exercise its power and dismiss them.

## II.    THE NARROW SCOPE AND PRIOR TERMINATION OF THE 2001 ORDER PROVIDE SEPARATE, ADDITIONAL GROUNDS FOR DISMISSAL

### A.    The FTC Has No Authority to Enforce the 2001 Order Against Gravity Defyer, an Unnamed and Unrelated Third Party

The 2001 Order cannot be enforced against Gravity Defyer because it is not named in that order. To enforce an administrative order against such an unnamed party, the government must show not only that the unnamed party had knowledge of the order, but also that the unnamed party undertook "active concert or participation" with named parties to violate the order. *See* FED. R. CIV. P. 65(d)(2)(C) (injunction automatically binds "persons who are in active concert or participation" with enjoined party); *Regal Knitwear Co. v. Nat'l Labor Rel. Board*, 324 U.S. 9, 14

(1945).

Active concert or participation has been found where a new company is a disguised version of a named business, a company established as a means of evading the order, or an entity that *knowingly* aids or abets a named party in violating the order. *See, e.g.*, *id.* at 13–14 (orders bind "successors and assigns" who operate as "merely a disguised continuance of the old employer") (cleaned up); *Golden State Bottling Co. v. Nat'l Labor Rel. Board*, 414 U.S. 168, 176 (1973); *Washington Metro. Area Transit Commn. v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 10 (D.C. Cir. 2015); *Fed. Trade Commn. v. Acquinity Interactive, LLC*, No. 14-60166-CIV, 2021 WL 4840585, at *2–3 (S.D. Fla. Sept. 29, 2021) ("Essentially, here, the FTC needs to show that [an unnamed party] knowingly 'aided and abetted [a named party] in carrying out the making, or assisting others in making, expressly or by implication, any false or misleading material representation.'") (cleaned up; quoting *ADT, LLC v. NorthStar Alarm Services, LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017)).

The FTC attempts to connect Gravity Defyer to the 2001 Order through Mr. Elnekaveh by alleging only that, "[b]y virtue of the business activities described below, Gravity Defyer acted in active concert or participation with Defendant Elnekaveh in violating" the 2001 Order. (Compl. at 7.) That attempt fails where the FTC makes no allegation at all that Gravity Defyer might be a new, disguised version of Gadget Universe, a company established as a means of evading the 2001 Order, or an entity that *knowingly* aided or abetted a named party in violating the 2001 Order. Even if the FTC had made any such allegations (and it has not), plausibility would present another significant hurdle.

Gravity Defyer, first of all, could not have possibly *knowingly* aided or abetted a named party in violating the 2001 Order where its greatest alleged sin was commissioning a clinical study

from a well-respected medical institution.

Second, Gravity Defyer has absolutely nothing to do with Gadget Universe. One company is the "disguised continuance" of another when it is formed to escape strictures placed on the older company—such as a limousine company founded to escape an order banning operation in the District of Columbia without required licensing. *Reliable Limousine*, 776 F.3d at 10. That two companies are owned by the same individual is insufficient. *Id.* Rather, it is essential that the new business carries on the activities of the old. *Id.* In such case, an order that applies to the old company will apply to "*any similar company*" with equal force. *Id.* (emphasis added). The Complaint does not, and could not, address any role that Gadget Universe may have had in Gravity Defyer's inception—there was none—nor does it assert that there was ever any overlap between the two companies' activities. Gadget Universe was a catalog and internet retailer of gadgets, like portable DVD players and headsets. Gravity Defyer manufactures and sells shoes.

Finally, the allegations the FTC does actually make conflict with any theory that Gravity Defyer could be merely a "means of evading" 2001 Order. The FTC's own allegations speak to a legitimate business selling "over 100 different styles of shoes for men and women, including athletic shoes, casual shoes, dress shoes, hiking shoes and boots, and sandals" through its "website, www.gravitydefyer.com; its in-house call center; stores located in Los Angeles, Huntington Beach, Palm Desert, and Encino, CA; and retailers such as The Walking Company, Hammacher Schlemmer, and Shoe City." (Compl. at 19.)

The FTC's position would make the Washington Post automatically liable for "violating" an order entered against Amazon. But, the law does *not* support such a theory. Because it does not, the Complaint fails to state a claim against Gravity Defyer, and the Court should dismiss all claims against the company.

**B.     The 2001 Order Reaches "Purported Fuel-Saving or Emissions-Related Products," Not Footwear**

The FTC asks this Court to assume that Parts II (on testimonial claims) and IV (on claims about testing) of the 2001 Order reach "any product" imaginable, all the way from fuel devices to footwear. The FTC asks this Court to make that assumption even though it is well-settled that "multi-product orders should be used with caution 'because they alter the scheme of penalties and enforcement procedures defined by the [FTC] Act.'" *Litton Industries, Inc. v. Fed. Trade Commn.*, 676 F.2d 364, 371–72 (9th Cir. 1982) (quoting *Standard Oil Co. v. Fed. Trade Commn.*, 577 F.2d 653, 661 (9th Cir. 1978)); *see also Am. Home Prod. Corp. v. Fed. Trade Commn.*, 695 F.2d 681, 705 (3d Cir. 1982).

By its plain terms, the 2001 Order reaches "any fuel-line magnet, or any purported fuel-saving or emissions-reducing product for use in conjunction with a motor vehicle," not footwear. Part I of the 2001 Order prohibits the following:

> IT IS ORDERED that respondents, directly or through any corporation, subsidiary, division, or other device, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of ***any fuel-line magnet, or any purported fuel-saving or emissions-reducing product for use in conjunction with a motor vehicle***, in or affecting commerce, shall not make any representation, in any manner, expressly or by implication
>
> > **A. about the effect of such product on fuel molecules;**
> >
> > **B. that such product improves fuel burn;**
> >
> > **C. that such product reduces fuel consumption;**
> >
> > **D. that such product reduces fuel consumption by any number, percentage, or rate;**
> >
> > **E. that such product reduces emissions or pollutants;**
> >
> > **F. that such product reduces emissions or pollutants by any number, percentage, or rate; or**
> >
> > **G. about the benefits, performance, or efficacy of such product**;
>
> unless, at the time of making such representation, respondents possess and rely upon competent and reliable evidence, which when appropriate must be competent

and reliable scientific evidence, that substantiates the representation.

(emphasis added). As highlighted with bolding, both the type of product and type of claims identified relate specifically to the efficacy of "fuel-line magnets" and "any other purported fuel-saving or emissions-reducing product." Parts II and III, then, bar certain misrepresentations as to testimonials or endorsements "in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of *any product*." Similarly, Part IV bars "misrepresent[ing] . . . the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research . . . in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of *any product* in or affecting commerce."

Here, the "any product" language of Parts II–IV of the 2001 Order logically refers to the same types of claims as Part I, which reaches only claims about "fuel-line magnet[s]" or "purported fuel-saving or emissions-reducing product[s] for use in conjunction with a motor vehicle." The "reasonably related" doctrine governing "fencing-in relief" supports this straightforward interpretation. When, in litigation, the FTC seeks so-called "fencing-in relief" that prohibits more than the alleged violative behavior, courts consider whether the relief sought is "reasonably related" to the alleged violations. *See, e.g., Litton Industries*, 676 F.2d at 371–72; *ECM Biofilms, Inc.*, FTC Dkt. No. 9358, 2015 WL 575402, at *219 (Jan. 28, 2015). If a remedy is reasonably necessary to the prevent future deception, it is permissible. *Litton Industries*, 676 F.2d at 373–74. However, if it sweeps too broadly to reach speech not reasonably likely to be misleading based on the prior conduct, the remedy violates the First Amendment. *Id.*

In determining whether an order's prohibitions are "reasonably related" to alleged violations, a court assesses not only the logical relationship between the violative conduct and the fenced-in conduct, but also the deliberateness of the violation, the seriousness of the violation in terms of consumer harm, the violator's past record, and the transferability of the unfair practice to

28

other products. *See, e.g., Removatron Int'l Corp. v. Fed. Trade Commn.*, 884 F.2d 1489, 1499 (1st Cir. 1989); *In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373, 467 (D. Md. 2020); *Sterling Drug, Inc. v. Fed. Trade Commn.*, 741 F.2d 1146, 1154 (9th Cir. 1984); *Fed. Trade Commn. v. SuperTherm, Inc.*, No. CV-20-08190-PCT-DWL, 2021 WL 3419035, at *9 (D. Ariz. Aug. 5, 2021).

The conduct of Gadget Universe was clearly peripheral to the FuelMAX case. Gadget Universe ran three advertisements for one of the FuelMAX devices. Beyond there being little if any logical connection between "fuel-line magnet[s]," "purported fuel-saving or emissions-reducing product," and footwear, there is simply not any deliberate or pervasive deception that would have warranted such broad, disfavored fencing-in relief usurping First Amendment rights by reaching "any product."

Gadget Universe and Mr. Elnekaveh agreed to a consent order covering "fuel-line magnet[s]" and "purported fuel-saving or emissions-reducing product[s]," not any possible type of product that existed then or could be developed. *Compare, e.g., BASF SE*, FTC Dkt. C-4744, 2021 WL 2379533, at *1 (June 1, 2021) (administrative consent order reaching only "any Dietary Supplement, Food, or Drug that contains one or more Omega-3 fatty acids or is promoted by a Respondent or its subsidiary to benefit cardiac, metabolic, or hepatic health or functions"); Stip. J., *Fed. Trade Commn. v. Gerber Prod. Co.*, No. 2:14-cv-06771-SRC-CLW [Dkt. 108] (D.N.J. July 15, 2019) (stipulated final judgment reaching only "infant formula"); Perm. Inj., *Fed. Trade Commn. v. Loma*, No. 1:11-cv-01483-MJG [Dkt. 206] (D. Md. Mar. 24, 2014) (stipulated final judgment reaching only "immigration services"); Stip. J., *Fed. Trade Commn. v. Reebok Int'l Ltd.*, No. 1:11-cv-02046-DCN [Dkt. 5] (N.D. Ohio Sept. 29, 2011) (stipulated final judgment reaching only "footwear and apparel that purports to improve or increase muscle tone, strength, or

activation"); Stip. J., *Fed. Trade Commn. v. Komaco Int'l, Inc.*, No. CV 02-04566 LGB (RNRx) [Dkt. 34] (C.D. Cal. Dec. 12, 2002) (stipulated final judgment reaching only "any Work-At-Home Opportunity"). The Court should dismiss Counts I and II of the Complaint where the 2001 Order is inapplicable to footwear.

### C.    The 2001 Order Is No Longer "in Effect" for Purposes of Section 5(*l*) Enforcement

Finally, the FTC can no longer enforce the 2001 Order because it is no longer "in effect," as required by Section 5(*l*). Even if the Order itself could be enforced after its expiration, it could only be enforced as to advertising and sales dating back to December 17, 2016—five years prior to the termination of the 2001 Order—in accordance with the five-year statute of limitations for civil penalty actions. 28 U.S.C. § 2462.

The limitations period has never, however, come into play in Section 5(*l*) cases. Instead, courts have required that, consistent with the language of the statute, an order be "in effect" at the time of filing in order to be enforced. *See, e.g.*, *LabMD, Inc. v. Fed. Trade Commn.*, 894 F.3d 1221, 1234 (11th Cir. 2018) (observing that, to enforce under Section 5(*l*), the FTC's "complaint would allege that the defendant *is subject to an existing cease and desist order* and has violated its terms") (emphasis added); *United States v. Louisiana-Pac. Corp.*, 754 F.2d 1445, 1447, 1450 (9th Cir. 1985) (holding that the court maintained a jurisdictional basis for a Section 5(*l*) civil penalty action where the relevant FTC administrative order "remained in effect"); *United States v. Danube Carpet Mills, Inc.*, 737 F.2d 988, 991 (11th Cir. 1984) (confirming that a prior FTC order "continued in force and effect from that date to the present" before determining if violations occurred for the purposes of Section 5(*l*)); *Fedders Corp. v. Fed. Trade Commn.*, 529 F.2d 1398, 1400, n.2 (2d Cir. 1976) (confirming that a prior order remained "in effect" before assessing enforcement); *United States v. Ancorp Nat. Servs., Inc.*, 516 F.2d 198, 200 (2d Cir. 1975) (same);

*United States v. J.B. Williams Co*., 498 F.2d 414, 431–32 (2d Cir. 1974) (taking no issue with lower court statement that the FTC must "establish[] that a cease and desist order is in effect" in actions under 5(*l*)); *United States v. Phelps Dodge Indus., Inc*., 589 F. Supp. 1340, 1367 (S.D.N.Y. 1984) ("Though the Order violated is old, it has remained fully in effect."); *United States v. Daniel Chapt. One*, 896 F. Supp. 2d 1, 3, 17 (D.D.C. 2012) (awarding civil penalties, under Section 5(*l*) based on an order that would expire if no complaint was filed prior to January 25, 2030).

Ordinarily, in Section 5(*l*) civil penalty cases, the FTC quotes the "in effect" statutory language, then alleges that a relevant, prior order in fact "remains in effect." *See, e.g.*, Compl., *Fed. Trade Commn. v. Twitter, Inc.*, No. 3:22-cv-03070 [Dkt. 1], at 3, 4, 16 (N.D. Cal. May 25, 2022) ("The Commission Order became final in March 2011 and remains in effect."); Compl., *Fed. Trade Commn. v. Facebook, Inc.*, No. 1:19-cv-02184 [Dkt. 1], at 10, 48 (D.D.C. July 24, 2019) ("The Commission Order became final in August 2012 and remains in effect."); Compl., *Fed. Trade Commn. v. iSpring Water Systems, LLC*, No. 1:19-cv-01620-AT [Dkt. 1], at 5, 11 (N.D. Ga. Apr. 10, 2019) ("The Commission Order was served on iSpring, became final in April 2017, and remains in effect."). In this case, the FTC makes no allegation at all as to the status of the order.

The FTC has long respected the precedent establishing the "in effect" limitation on enforcement. It, in fact, did so even as it undertook efforts to terminate orders without requiring petition by a respondent. Prior to 1995, FTC administrative orders normally did *not* include termination language, and respondents were required to petition the agency to terminate an order. Fed. Trade Commn., *Policy Statement Regarding Duration of Competition and Consumer Protection Orders*, 60 Fed. Reg. 42,569, 42,572 (Aug. 16, 1995). In 1995, the FTC issued a policy statement, and accompanying rule, providing that the agency would "terminate ('sunset')" all

existing and future "competition and consumer protection administrative orders automatically after twenty years." *Id.* at 42,569; *see also* Proposed Rule, 60 Fed. Reg. 42,481 (Aug. 16, 1995); Final Rule, 60 Fed. Reg. 58,514 (Nov. 28, 1995); 16 C.F.R. § 3.72(b)(3). As a part of its implementation, the FTC began including standard termination language, like that found in the 2001 Order, providing for the termination of those administrative orders either 10 or 20 years after issuance. *See Policy Statement*, 60 Fed. Reg. 42,569, at 42,571, n.8 (providing the standard language).

The FTC reasoned that orders in effect for 20 years "will have served their purpose" and, if not terminated, could impose outdated requirements or prompt companies to be "more cautious than their competi[tors] within the range of permissible advertising," resulting in "competitive imbalances."[17] In implementing that policy change, the FTC still clearly and correctly reiterated the "in effect" limitation of 5(*l*). Final Rule, 60 Fed. Reg. 58,514, at 58,514, n.2. The agency stated that the policy "will not affect the Commission's authority pursuant to Section 5(*l*) of the FTC Act to seek civil penalties for violations of an order *that remains in effect*." *Id.*[18]

"While Commission practice does not constitute conclusive proof of legislative intent, consistent adherence to [a procedure] indicates, at the very least, that the Commission and the Attorney General consider it an extremely effective and practical means for enforcing the

---

[17] *Policy Statement*, 60 Fed. Reg. 42,569, at 42,573; *see also Rule Incorporating "Sunset Policy" for Existing Administrative Orders in Consumer Protection and Antitrust Cases* (Nov. 20, 1995), at https://www.ftc.gov/news-events/news/press-releases/1995/11/ftc-rule-incorporating-sunset-policy-existing-administrative-orders-consumer-protection-antitrust.

[18] *See also* Daniel Kaufman, *FTC Defendants Stumble After a Disorderly Race to the Courthouse* (Mar. 24, 2023), https:// www.adttorneyslawblog.com /ftc/ftc-defendants-stumble-after-a-disorderly-race-to-the-courthouse/ (blog post by former Acting Director of FTC Bureau of Consumer Protection noting that "last June" FTC sued Gravity Defyer based on the order from "back in 2001," creating "quite a close call on the timing front" given that "as you may know, FTC administrative orders last 20 years"; although the author miscounted the age of the 2001 order as of 2022, his commentary reaffirms the FTC's longstanding position that orders become unenforceable after 20 years).

Commission orders." *United States v. St. Regis Paper Co.*, 355 F.2d 688, 698–99 (2d Cir. 1966)

(upholding Section 5(*l*) statutory procedure requiring FTC referral to the United States Attorney);

*see also United States v. Standard Distributors, Inc.*, 267 F. Supp. 7, 10 (N.D. Ill. 1967) (finding

20 years of FTC practice "persuasive authority").

      At this point, thousands of administrative orders, issued since the establishment of the FTC

in 1914, either terminated with the issuance of the "sunset policy," or like the 2001 Order at issue

in this case, terminated or will terminate based on termination language. *See, e.g.*, *Microsoft Inc.*,

131 F.T.C. 1113, 1126 (F.T.C. 2001) (allowing for termination on May 15, 2021 if no complaint

has been filed); *Valeant Pharmaceuticals Int'l, Inc.*, FTC Dkt. No. C-4343, 2011 WL 7432274, at

\*34 (Dec. 9, 2011) (allowing for termination on February 8, 2022 if no complaint has been filed);

*Quicken Loans, Inc.*, 135 F.T.C. 424, 439 (F.T.C. 2003) (allowing for termination on April 8, 2023

if no complaint has been filed); *Cephalon, Inc.*, 138 F.T.C. 583, 628 (F.T.C. 2004) (allowing for

termination on September 20, 2024 if no complaint has been filed); *Kellogg Co.*, FTC Dkt. C-

4262, 2009 WL 2402679, at \*7 (July 27, 2009) (allowing for termination on July 27, 2029 if no

complaint has been filed); *Google Inc.*, 152 F.T.C. 435 (F.T.C. 2011) (allowing for termination on

October 13, 2031 if no complaint has been filed); *BASF SE*, FTC Dkt. No. C-4744, 2021 WL

2379533, at \*8 (June 1, 2021) (allowing for termination on May 25, 2041 if no complaint has been

filed). Particularly given the effects on so many companies and individuals under FTC orders, the

FTC cannot now reinterpret its enabling statute to allow for perpetual enforcement.

## **CONCLUSION**

For the foregoing reasons, Gravity Defyer and Mr. Elnekaveh's motion to dismiss should

be granted, along with such other and further relief as the Court deems just and proper.

Dated: April 7, 2023                               Respectfully submitted,

*/s/ J. Kathleen Bond*
J. Kathleen Bond (#985786)
Samuel A. Butler (#D00479)
Lathrop GPM, LLP
600 New Hampshire Avenue, NW
The Watergate - Suite 700
Washington, DC 20037
Phone (202) 295-2200
katie.bond@lathropgpm.com
samuel.butler@lathropgpm.com

*Attorneys for Defendants*
*Gravity Defyer Medical Technology Corp.*

Jonathan W. Emord (#407414)
Emord & Associates, PC
11808 Wolf Run Lane
Clifton, VA  20124
Phone (202) 466-6937
jemord@emord.com

*Attorney for Defendant Alexander Elnekaveh*

34